UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

IN RE: PHOTOCHROMIC LENS
ANTITRUST LITIGATION

MDL Case No.: 8:10-MD-2173-T-27EAJ

_____/

## REPORT AND RECOMMENDATION

Before the Court are **Direct Purchaser Plaintiffs' Motion for Class Certification** (Dkt. 285), **Defendants' Memorandum in Opposition to Direct Purchaser Plaintiffs' Motion for Class Certification** (Dkt. 452), and **Direct Purchaser Plaintiffs' Reply in Support of Class Certification** (Dkt. 443).[1] At the hearing on the motion, Hal Singer, Ph.D. ("Dr. Singer") testified in support of Direct Purchaser Plaintiffs' motion for class certification, and Gregory Leonard, Ph.D. ("Dr. Leonard") testified for Defendants.[2]

Having reviewed the parties' briefs, their supporting affidavits including expert reports, and the transcript from the hearing, and after due consideration, the Court recommends denying the motion for certification for the proposed class of Direct Purchaser Plaintiffs.

## Background

This case involves photochromic lenses, or prescription eyeglasses that darken automatically

---

[1] The motion for class certification was referred to the undersigned for a report and recommendation. (Dkt. 298)

[2] Also before the Court are the Amended Declaration of Jennifer MacNaughton in support of Direct Purchaser Plaintiffs' motion for class certification (Dkt. 370), Class Certification Report of Hal J. Singer, Ph.D. (Dkt. 441), Declaration of Michelle Bushman in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification (Dkt. 325), and Expert Report of Gregory K. Leonard, Ph.D. (Dkt. 453).

when exposed to ultraviolet light and fade back to clear indoors.  Plaintiffs[3] allege that the leading manufacturer of these lenses, Defendant Transitions Optical, Inc.[4] ("Transitions"), engaged in anticompetitive conduct to create a monopoly and maintain artificially inflated prices.  According to Plaintiffs, Transitions conspired with Essilor of America, Inc. and Essilor Laboratories of America, Inc. to restrain competition and enforce exclusive arrangements for Transitions' lenses at all levels of the distribution chain.

Plaintiffs contend that this conduct attracted the attention of the Federal Trade Commission ("FTC"), which began investigating Transitions' business practices in 2009.  In April 2010, Transitions and the FTC signed a consent decree that bars Transitions from certain practices such as requiring its customers to enter into agreements promising not to sell photochromic lenses made by competing manufacturers.

Here, Direct Purchaser Plaintiffs seek certification of a class comprising those entities that purchased Transitions lenses directly from Transitions or its alleged co-conspirators, Essilor of America, Inc.[5] and Essilor Laboratories of America, Inc.[6] (collectively "Essilor"), from March 3, 2006 to the present.  Direct Purchaser Plaintiffs submit a diagram illustrating the relationship among various groups of direct purchasers and Defendants that is attached as App. I.

---

[3] In addition to Direct Purchaser Plaintiffs, there is a proposed class of Indirect Purchaser End-User Plaintiffs who have a pending motion for class certification. (Dkt. 290) Plaintiffs also include Insight Equity A.P.X. d/b/a Vision-Ease Lens Worldwide.

[4] Established in 1990, Transitions is jointly owned by PPG Industries, Inc., with 51 percent ownership of Transitions, and Essilor International, with 49 percent ownership of Transitions. Neither PPG Industries, Inc. nor Essilor International are parties to this lawsuit.

[5] Essilor of America, Inc. is a lens caster.

[6] Essilor Laboratories of America, Inc. owns wholesale ophthalmic laboratories in the United States.

**Legal Standard**

The class advocate bears the burden of showing that the requirements of Federal Rule of Civil Procedure 23 are satisfied. See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 614 (1997). Under Rule 23(a), plaintiffs must prove numerosity, commonality, typicality, and adequacy of representation.  In addition, at least one subsection of Rule 23(b) must be satisfied.  Vega v. T-Mobile USA, Inc., 564 F.3d 1256, 1265 (11th Cir. 2009) (footnote and citation omitted).  Here, Direct Purchaser Plaintiffs seek certification under Rule 23(b)(3), which requires that common questions of law or fact predominate and that a class action is superior to other methods for adjudicating the case.

While a court must conduct a "rigorous analysis" to determine whether the requirements of Rule 23 have been satisfied, Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011) (citation omitted), class certification is not a decision on the merits of the underlying suit.  Thus, courts reviewing motions for class certification should "avoid merits determinations to the extent practicable[.]" Babineau v. Fed. Express Corp., 576 F.3d 1183, 1190 (11th Cir. 2009).  However, "the court may, and sometimes must, inquire into the merits in order to determine whether the requirements of Rule 23 have been satisfied." Coastal Neurology, Inc. v. State Farm Mut. Auto. Ins. Co., 458 F. App'x 793, 794 (11th Cir. 2012) (per curiam) (unpublished) (citation omitted).  This is because "class determination[s] generally involve[] considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." Wal-Mart, 131 S. Ct. at 2552 (citations and internal quotation marks omitted).

## Analysis

Direct Purchaser Plaintiffs are Nouveau Vision, Inc., Optical Supply, Inc., Florida Optical Express, Inc., Central Illinois Vision Associates, Ltd., and B&B Eyes, Inc.[7]   They are suing Defendants for conspiracy and monopolization under Section 1 and Section 2 of the Sherman Act,[8]

---

[7] Nouveau Vision, Inc. is an independent wholesale laboratory with its principal place of business in Redmond, Washington.  Optical Supply, Inc. is an independent wholesale laboratory with its principal place of business in Rainbow City, Alabama.  Florida Optical Express, Inc. is an independent wholesale laboratory with its principal place of business in Altamonte Springs, Florida. Central Illinois Vision Associates, Ltd. is an optical retailer and eye care practitioner with its principal place of business in Charleston, Illinois.  B&B Eyes, Inc. has ceased business operations but was an optical retailer and eye care practitioner.  However, B&B Eyes, Inc. still exists as a corporation and has its principal place of business in New York, New York.

[8] Section 1 of the Sherman Act states:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

15 U.S.C. § 1 (2004).

Section 2 of the Sherman Act provides that:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

15 U.S.C. § 2 (2004).

15 U.S.C. §§ 1-2.[9]  Direct Purchaser Plaintiffs propose a class that would encompass:

> All persons or entities that purchased Transitions lenses directly from any Defendant or any Essilor-owned Lab at any time between March 3, 2006 and the present (the "Class Period"). Excluded from the Class are Defendants and their subsidiaries, parents, or affiliates, and government entities. Also excluded from the Class are persons or entities who, during the Class Period, purchased only Transitions lenses sold by a non-Defendant, and subsequently resold by an Essilor-owned Lab.

(Dkt. 442 at 7)

Direct Purchaser Plaintiffs contend they meet all the requirements of Rule 23(a) and 23(b)(3).  Defendants argue that they fail in three categories: typicality, adequacy, and predominance.[10]  However, as the Court has an independent obligation to ensure that Rule 23 is satisfied, each of the requirements will be examined.  See Martinez-Mendoza v. Champion Int'l Corp., 340 F.3d 1200, 1216 n.37 (11th Cir. 2003) (citations omitted).

**I. Rule 23(a)**

**A. Numerosity**

Rule 23 requires the class be so numerous that joinder is "impracticable." Fed. R. Civ. P. 23(a)(1).  As a general rule, a class with more than forty members crosses this threshold. In re Checking Account Overdraft Litig., 275 F.R.D. 666, 672 (S.D. Fla. 2011).  Direct Purchaser

---

[9] In their Consolidated Amended Complaint, Direct Purchaser Plaintiffs assert claims for monopolization against Transitions (Count I); attempted monopolization against Transitions (Count II); conspiracy to monopolize against all Defendants (Count III); conspiracy to attempt to monopolize against all Defendants (Count IV); and conspiracy to restrain trade against all Defendants (Count V).  (Dkt. 127 at 38-49)

[10] Defendants also note that if Direct Purchaser Plaintiffs sought to certify subgroups within the class, the subgroup of lens casters would not satisfy numerosity. (Dkt. 452 at 16)  However, this issue need not be addressed as Direct Purchaser Plaintiffs do not seek certification of subgroups, and the Court does not find it necessary to recommend that approach.

5

Plaintiffs state that their class encompasses approximately seventeen (17) lens casters that purchased from Transitions; approximately 1,500 independent wholesale laboratories – not owned or controlled by Essilor during the class period – that purchased photochromic lenses from Essilor of America, Inc.; and more than 36,000 integrated retailers and independent eye-care professionals that purchased from Essilor Laboratories of America, Inc.  As the proposed class embraces thousands of members, Direct Purchaser Plaintiffs have met the numerosity requirement.

### B. Commonality

The commonality requirement of Rule 23(a)(2) is a "relatively light burden" that requires one or more common questions of law and fact; it does not demand complete uniformity.  Vega, 564 F.3d at 1268.  By focusing on shared questions of law and fact, commonality ensures that the class action is "susceptible to class-wide proof."  Murray v. Auslander, 244 F.3d 807, 811 (11th Cir. 2001) (citation omitted).  Direct Purchaser Plaintiffs explain that in antitrust cases, "courts in this Circuit have consistently held that allegations of price-fixing, monopolization, and conspiracy by their very nature involve common questions of law or fact." In re Terazosin Hydrochloride, 220 F.R.D. 672, 686 (S.D. Fla. 2004) (citations omitted).  Here, Direct Purchaser Plaintiffs assert that Defendants' allegedly anticompetitive conduct and resulting higher prices create common issues shared by all class members.  This element is satisfied.

### C. Typicality

Typicality exists if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  Typicality is similar to commonality in that both are meant to ensure there is a "sufficient nexus" between the legal claims of the named class representatives and the class as a whole.  Prado-Steiman v. Bush, 221 F.3d 1266, 1278 (11th

Cir. 2000) (citations omitted).  This nexus may be found where "the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." Id. at 1279 (citing Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 157 n.13 (1982)).

Direct Purchaser Plaintiffs state that typicality is established because the class representatives and class members all purchased Transitions lenses from Defendants and allegedly paid artificially inflated prices due to Defendants' efforts to restrain trade and create a monopoly for Transitions. In challenging this element, Defendants contend that typicality is thwarted by: (1) overwhelming differences in the buying power and practices of class representatives and the class as a whole; and (2) an "Illinois Brick problem"[11] that requires the named class representatives to prove conspiracy while lens casters have no such requirement.

Three of the five class representatives are independent wholesale laboratories and two are independent eye-care professionals.[12]  None are lens casters.  Lens casters purchase from Transitions, negotiating on an individual basis and securing various rebates and discounts.  In contrast, independent wholesale laboratories buy Transitions lenses through Essilor of America, Inc., either purchasing individually or through buying groups.  These wholesale laboratories may receive rebates and discounts from Essilor of America, Inc. and also from Transitions.  Independent eye-care professionals purchase their lenses through Essilor Laboratories of America, Inc. and can be subject to supply and demand forces that are distinct from those operating on other members of the class. Retailers function on yet another level, especially because large companies such as Wal-Mart or

---

[11] Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977).

[12] Independent eye-care practitioners are identified as "ECPs" in the diagram in App. I.

Costco exercise considerable leverage in negotiating prices for their photochromic lenses. Defendants say these underlying factual differences make it impossible for any of the named class members to be typical of the class a whole.  See generally In re Graphics Processing Units Antitrust Litig., 253 F.R.D. 478, 489 (N.D. Cal. 2008) (denying class certification for failure to satisfy typicality where proposed class included individual consumers and large wholesalers).

Defendants also argue that legal differences preclude typicality.  This contention arises from a limitation created by Illinois Brick, in which the U.S. Supreme Court held that only direct purchasers – those who buy directly from the alleged monopoly supplier – can sue for antitrust violations under federal antitrust law. See 431 U.S. at 740-41, 746.  As applied to this case, then, only lens casters could sue because they alone purchased directly from Transitions.  But there is an exception to Illinois Brick in which class members have standing if they purchased from entities that conspired with the entity holding monopoly power.  Lowell v. Am. Cyanamid Co., 177 F.3d 1228, 1231-32 (11th Cir. 1999) (holding that Illinois Brick does not bar federal antitrust lawsuits by purchasers who bought from dealers that conspired with a manufacturer to fix prices).

Differences in the underlying facts do not necessarily derail the class.  "[T]he typicality requirement may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members." Appleyard v. Wallace, 754 F.2d 955, 958 (11th Cir. 1985) (citations and internal quotation marks omitted).[13]  The core issue is whether the claims of class representatives and class members "arise[] from the same event or practice or course of

---

[13] See also In re Marine Hose Antitrust Litig., No. 08-MDL-1888-GRAHAM/TURNOFF, 2009 U.S. Dist. LEXIS 71020, at *28 (S.D. Fla. July 31, 2009) (citation omitted) ("If the party advancing the class can establish the same unlawful conduct was directed at or affected both the class representative and the class itself, then the typicality requirement is usually met irrespective of varying fact patterns which underlie the individual claims.").

conduct . . . [and] are based on the same legal theory." In re Carbon Dioxide Antitrust Litig., 149 F.R.D. 229, 233 (M.D. Fla. 1993) (citation and internal quotation marks omitted).  Factual differences can impede typicality when they have the potential to "force the named representatives to make arguments at trial that will be adverse to other class members' claims."  In re Vioxx Prods. Liab. Litig., No. 08-3627, 2008 WL 4681368, at *12 (E.D. La. Oct. 21, 2008) (citation omitted).

Plaintiffs counter that the class representatives' need to prove conspiracy between Transitions and Essilor does not preclude typicality because the named representatives' claims share "a strong similarity of legal theories" with those of the class as a whole.  Appleyard, 754 F.2d at 958 (citations omitted).  "Typicality, however, does not require identical claims or defenses."  Kornberg v. Carnival Cruise Lines, Inc., 741 F.2d 1332, 1337 (11th Cir. 1984).

Here, this concern may be alleviated because the named class representatives must prove impact on the lens casters to prove their claims.  Typicality is a close call, however, for the reasons that follow in discussing the issue of adequacy of representation, which is somewhat related.

### D. Adequacy

A class may be certified only if "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  Adequacy requires a court to undertake two inquiries: "(1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action."  Busby v. JRHBW Realty, Inc., 513 F.3d 1314, 1323 (11th Cir. 2008) (citation and internal quotation marks omitted). For a conflict to warrant denial of class certification, "the conflict must be a 'fundamental' one going to the specific issues in controversy."  Valley Drug Pharm. v. Geneva Pharms., Inc., 350 F.3d 1181, 1189 (11th Cir. 2003) (citations omitted).  Plaintiffs have the burden of establishing that no

fundamental conflicts exist, id. at 1190, but defendants must provide at least some evidence of facts supporting the existence of a conflict, see id. at 1191-94 (discussing evidence of factual basis of the purported conflict).

Direct Purchaser Plaintiffs assert that they fulfill both prongs of the adequacy element because there are no substantial conflicts[14] between the class representatives and members of the class and the class representatives will pursue the action diligently.[15]  In response, Defendants submit that exclusivity agreements create both "winners and losers" because customers get better prices in exchange for agreeing to exclusive arrangements. (Dkt. 434 at 127) Defendants thus conclude that some lens casters benefited from the alleged anticompetitive conduct and assert that the interests of the class representatives are antithetical to the interests of those lens casters.

Additionally, Defendants again raise Illinois Brick as an impediment because the class representatives need to prove conspiracy.  As lens casters do not have to rely on the conspiracy exception to Illinois Brick, this additional legal burden on the other purchasers is an "irreconcilable conflict" that should defeat the adequacy requirement, in Defendants' view. (Dkt. 434 at 24)

In Valley Drug, the Eleventh Circuit reversed certification for a class of drug wholesalers alleging that the defendant drug makers illegally kept generic versions of the brand-name medication

---

[14] Although Direct Purchaser Plaintiffs maintain that the Court previously rejected Defendants' arguments about potential conflicts between class representatives and class members in a prior discovery order (Dkt. 442 at 16 (citing Dkt. 225 at 6-8)), the Court ruled only that Defendants had failed at that point to produce evidence of any conflicts to warrant downstream discovery.

[15] Defendants do not challenge the second prong of the adequacy element, whereby Direct Purchaser Plaintiffs assert that the class representatives are actively involved in the case and represented by counsel who are experienced in complex antitrust litigation. (Dkt. 442 at 15-16)

Hytrin[16] off the market. Valley Drug, 350 F.3d at 1184.  The defendants argued that the adequacy requirement could not be met because some wholesalers made more money by selling higher priced brand name medications instead of generics.  Id. at 1191.  Finding the allegation warranted further exploration, the court remanded so defendants could conduct discovery to determine whether some wholesalers experienced a "net benefit" or a "net loss" from the lack of generic alternatives. Id. at 1194-95. Valley Drug makes clear that the adequacy requirement cannot be established "where the economic reality of the situation leads some class members to have economic interests that are significantly different from – and potentially antagonistic to – the named representatives purporting to represent them." Id. at 1195 (footnote omitted).  See also Pickett v. Iowa Beef Processors, 209 F.3d 1276, 1280 (11th Cir. 2000) (denying certification for class that included members claiming harm from the same forward contracts that other members benefited from).

At the hearing on class certification, Defendants stated that some lens casters paid lower prices for Transitions' lenses and received technological benefits[17] by entering into exclusivity agreements with Transitions.  Defendants maintain that exclusivity arrangements inevitably create some "winners" and that any class embracing those who benefit is invalid under the adequacy element.  When asked by the Court to identify specific winners, Defendants proffered that lens casters Carl Zeiss Vision, Essilor, Hoya, and Younger benefited by signing exclusivity agreements with Transitions. (Dkt. 434 at 130)   Therefore, Defendants maintain that the class is unsustainable because some members of the class "willingly entered" into the same agreements giving rise to the

---

[16] Hytrin, which is the brand name for the chemical compound terazosin hydrochloride,  is used to treat hypertension and benign prostatic hyperplasia. Valley Drug, 350 F.3d at 1184.

[17] Defendants asserted that Transitions cooperated with lens casters who entered into exclusivity agreements to ensure that their "technologies would mesh." (Dkt. 434 at 130)

lawsuit.  See Pickett, 209 F.3d at 1280 (concluding that the class representatives "could not possibly provide adequate representation to a class that includes producers who willingly entered into [the agreements] . . . as well as those who complain of and claim harm from the practice").

Given the potentiality that at least some of the lens casters may have benefited from the exclusivity agreements, it is telling that no lens casters are included among the class representatives of Direct Purchaser Plaintiffs, all of whom are alleged to have been harmed by the anticompetitive conduct of Transitions and Essilor.  See Valley Drug, 350 F.3d at 1193 (absence of three national wholesalers representing the bulk of the claims from class representatives "suggests that the interests of the named representatives are not substantially aligned with the interests of all of the class members whom they purport to represent").

Both Valley Drug and Pickett are formidable barriers to certification in this case.  Direct Purchaser Plaintiffs incorrectly place a "heavy burden" on Defendants to show that some class members benefited from the complained of conduct. (Dkt. 442 at 17)  Yet while Defendants must provide some evidence that a conflict exists, see generally Brinker v. Chicago Title Ins. Co., No. 8:10-cv-1199-T-27AEP, 2012 WL 1081182, at *2 (M.D. Fla. Mar. 30, 2012),[18] it is Direct Purchaser Plaintiffs' burden to demonstrate that there is no fundamental conflict of interest between the class representatives and lens casters.[19]  This potentially serious conflict defeats the adequacy

_____

[18] In Brinker, the court rejected a challenge to adequacy where defendants offered no more than "unsupported assertion[s]" that some class members benefited. Brinker, 2012 WL 1081182 at *2.

[19] Concededly, Defendants' expert,  Dr. Leonard, testified that he did not examine the data to determine whether any lens caster benefited from the exclusivity agreements. (Dkt. 434 at 120-21)  However, the focus of Dr. Leonard's testimony and of Plaintiffs' expert, Dr. Singer, was whether Direct Purchaser Plaintiffs have a workable method of showing antitrust impact on lens casters, and in turn, on the proposed class as a whole.

requirement.  Accordingly, it is unnecessary to address Defendants' alternative argument that <u>Illinois Brick</u> concerns preclude a finding of adequacy.

In any case, even assuming that Direct Purchaser Plaintiffs are not hindered by a fundamental conflict between at least some lens casters and the class representatives, other defects in proof make class certification unsustainable.

## II. Rule 23(b)(3)

Direct Purchaser Plaintiffs claim that their class satisfies Rule 23(b)(3), which requires "(1) that common questions of law or fact predominate over questions affecting only individual class members ('predominance'); and (2) that a class action is superior to other available methods for adjudicating the controversy ('superiority')." <u>Vega</u>, 564 F.3d at 1265 (footnote and citations omitted).

Direct Purchaser Plaintiffs also have failed to overcome the substantial hurdle posed by the predominance requirement for class certification.

### A. Predominance

Predominance is "perhaps the central and overriding prerequisite for a Rule 23(b)(3) class." <u>Id.</u> at 1278.  In establishing that common issues control, "it is not necessary that all questions of fact or law be common, but only that some questions are common and that they predominate over individual questions." <u>Klay v. Humana, Inc.</u>, 382 F.3d 1241, 1254 (11th Cir. 2004) (citation and internal quotation marks omitted).  Nonetheless, the predominance requirement of 23(b)(3) can be a significant barrier for putative classes.  Although similar to the commonality element of Rule 23(a)(2), "the predominance criterion is far more demanding." <u>Amchem</u>, 521 U.S. at 624 (citation omitted).  It "imposes a more rigorous obligation upon a reviewing court to ensure that issues

13

common to the class predominate over those affecting only individual class members." <u>Sullivan v. DB Invs., Inc.</u>, 667 F.3d 273, 297 (3d Cir. 2011) (citation omitted).

Direct Purchaser Plaintiffs contend that common questions of law and fact predominate because their case focuses on Defendants' conduct and the effect of that conduct on the market. As such, they do not rely on facts that are particular to any class member. Moreover, Direct Purchaser Plaintiffs state that their expert, Dr. Singer, has documented "antitrust impact" on a classwide basis. This impact is quantified as an overcharge or the amount paid in excess of what prices for photochromic lenses would be in a market that is free from Defendants' allegedly anticompetitive activities.

Defendants maintain that Direct Purchaser Plaintiffs cannot satisfy the predominance requirement because they cannot prove impact on all lens casters, much less every class member. Defendants also find serious errors in the methodology employed by Direct Purchaser Plaintiffs to demonstrate predominance.

### 1. Legal standard for impact

In his class certification report for Direct Purchaser Plaintiffs, Dr. Singer conducted two analyses to measure antitrust impact on lens casters: one with fourteen lens casters and one with seventeen lens casters. He found impact on twelve out of the fourteen lens casters, and fifteen out of the seventeen lens casters, which represents an impact on 86 percent and 88 percent of lens casters, respectively. (Dkt. 441 at 10 n.27, 87-89) As such, his analysis does not establish that all lens casters were affected by the allegedly anticompetitive practices. Arguing that impact to the vast majority of the class is sufficient, Direct Purchaser Plaintiffs maintain that a proposed class may

include members who did not suffer injury.[20]

Defendants contend that antitrust injury must be shown for all class members.  They argue that the undisputed lack of impact on all lens casters is fatal to predominance in two ways.  First, Dr. Singer's analysis depends on a domino-like effect whereby higher prices for lens casters lead to higher prices for the rest of the class.  Second, Defendants contend that if lens casters are not affected across-the-board, impact on the rest of the class is likewise diluted.

In asserting that impact need not be shown for every class member, Direct Purchaser Plaintiffs rely largely on case law outside the Eleventh Circuit.  See, e.g., Kohen v. Pacific Inv. Mgmt Co., 571 F.3d 672, 677 (7th Cir. 2009) (stating that it is "inevitable" that "a class will often include persons who have not been injured by the defendant's conduct").[21]  However, Defendants are correct that Eleventh Circuit precedent on predominance requires a methodology capable of showing that every class member was impacted by the antitrust violation.  See Shumate & Co. v. National Ass'n of Securities Dealers, Inc., 509 F.2d 147, 155 (5th Cir. 1975) ("[P]roof of injury to

---

[20] Under a rigid standard requiring impact on each class member, Direct Purchaser Plaintiffs observe that a potential defendant could defeat class certification by charging lower prices to a single class member, while thousands of others pay higher prices due to unlawful anticompetitive conduct.  (Dkt. 434 at 19)  While acknowledging the logic underlying that assertion, the Court cannot ignore the binding case law of this circuit.

[21] See also In re Whirlpool Corp. Front-Loading Washer Prods. Liability Litig., 678 F.3d 409, 420 (6th Cir. 2012) (citation omitted) ("Even if some class members have not been injured by the challenged practice, a class may nevertheless be appropriate."); Sullivan v. DB Investments, Inc., 667 F.3d 273, 305 (3d Cir. 2011) (en banc) (predominance does not require each class member to have a "valid" claim); Strickland v. DeVaughn, 594 F.3d 1188, 1198 (l0th Cir. 2010); Mims v. Stewart Title Guar. Co., 590 F.3d 298, 308 (5th Cir. 2009); In re Chocolate Confectionary Antitrust Litig., No. 1:08–MDL–1935, 2012 WL 6091568, at *17 (M.D. Pa. Dec. 7, 2012) (finding predominance met where plaintiffs found ninety-eight  percent of direct purchasers impacted by price increases); In re Checking Account Overdraft Litig., 275 F.RD. 666, 678 n.9 (S.D. Fla. 2011) (citations omitted) (availability of defense to some plaintiffs' claims no bar to class certification).

business or property of *each class member* is critical for the determination of defendants' liability to any individual.") (emphasis added); see also Sikes v. Teleline, Inc., 281 F.3d 1350, 1365 (11th Cir. 2002) (reversing class certification after finding that it was not possible to determine class-wide injury through common proof); Alabama v. Blue Bird Body Co., 573 F.2d 309, 327-28 (5th Cir. 1978) (reversing grant of class certification where the court expected individual inquiries to be necessary).[22]

Direct Purchaser Plaintiffs' best-case scenario shows that 88 percent of lens casters were impacted, leaving 12 percent that were not. Therefore, their methodology fails to establish the classwide impact required to satisfy Rule 23(b)(3)'s predominance requirement. Moreover, even assuming that Direct Purchaser Plaintiffs need not show impact on every lens caster, serious problems with their methodology prove fatal to the predominance requirement.

### 2. Direct Purchaser Plaintiffs' methodology

Defendants assert that Direct Purchaser Plaintiffs' methodology is flawed for three main reasons: (1) the analysis does not rely on common proof because three distinct models are used to analyze the data; (2) Dr. Singer inappropriately used "price card" data instead of more pertinent transactional data; and (3) Dr. Singer employed a statistical significance[23] standard of 50 percent, which is contrary to the stricter 5 percent significance level mandated by accepted practice.

### (a) Three Models

In his analysis, Dr. Singer divides the class into three groups: lens casters in Group A;

---

[22] Decisions of the former Fifth Circuit handed down on or before September 30, 1981 are binding on this Court. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

[23] Statistical significance measures the probability that a particular correlation occurred by chance. Hamer v. Atlanta, 872 F.2d 1521, 1526 (11th Cir. 1989).

laboratories, retailers, and independent eye care professionals in Group B; and customers of Essilor-owned laboratories in Group C. (Dkt. 441 at 8) Dr. Singer postulates that by showing the effect of Transitions' exclusivity agreements on prices for Group A, he can trace that impact on purchasers in Groups B and C.

Starting with Group A, Direct Purchaser Plaintiffs' theory is that prices to lens casters should rise as more of Transitions' sales resulted from exclusivity agreements. Culling data from different sources, Dr. Singer concluded that the percentage of Transitions lenses sold under exclusivity agreements rose from 42.3 percent in 2000 to 70.5 percent in 2009. (Dkt. 441 at 85) He then determined that a ten-percentage point increase in the percentage of lenses sold by Transitions under exclusivity arrangements led, on average, to a 2.7 percent increase in prices charged to lens casters. (Id. at 88)

Dr. Singer then analyzed the impact of those higher prices on the laboratories, retailers, and independent eye care professionals in Group B who purchased from Essilor of America, Inc. He concluded that a 10 percent hike in Transitions' prices resulted in a 7.7 percent increase in the prices paid by class members in Group B. (Id. at 93, 98) Dr. Singer did not conduct an analysis of Group C in his class certification report but did so for his subsequent merits report. (Dkt. 450 at 96-97) Group C includes class members who purchased Transitions lenses from laboratories owned by Essilor Laboratories of America, Inc. According to his analysis, for every 10 percent increase in prices paid by Essilor Laboratories of America, Inc., Group C class members paid a 4.9 percent to 5.3 percent increase for lenses.

Defendants fault Dr. Singer for dividing the class in this manner and analyzing each group with different methodologies and data sources. Defendants submit that Plaintiffs' inability to

include all class members in the same model "indicates that proof is not common to the class, at least without having to create a separate model or category for each particular kind of purchaser, which itself would suggest that individual issues predominate over those common to the class." In re Graphics Processing, 253 F.R.D. at 496.

However, the use of several models is not necessarily problematic, and courts have certified classes when multiple impact models work in concert to demonstrate a common method of proof. See, e.g., In re Flonase Antitrust Litig., 284 F.R.D. 207, 221-23 (E.D. Pa. 2012) (describing use of different models to measure impact to class members who suffered varying types of injuries).[24] The problem here is that Direct Purchaser Plaintiffs do not merely use multiple models; there are other deficiencies which raise questions regarding the soundness of the underlying methodology. As discussed subsequently, it is the combination of these problems that renders the approach untenable.

**(b) Use of Price Card Data**

In analyzing the impact on lens casters for his class certification report, Dr. Singer used "price card" data, instead of transactional data, which reflect the prices actually paid to Transitions. Price cards refer to the quotes for prices given by Transitions to lens casters; however, the actual prices paid by lens casters may differ after negotiations, rebates, and other adjustments. Defendants' expert, Dr. Leonard, testified that when he replicated Dr. Singer's analysis of Group A using actual transactional prices, only two out of fourteen lens casters are impacted. (Dkt. 434 at 113)

In response, Direct Purchaser Plaintiffs assert that Dr. Singer had to use price card data because Defendants' transactional data were not accurate at the time that he was compiling his class-

---

[24] See also In re TFT-LCD (Flat Panel) Antitrust Litig., 267 F.R.D. 583, 602-03 (N.D. Cal. 2010) (certifying class where expert used three models for measuring impact to direct purchasers).

certification report.  Additionally, Direct Purchaser Plaintiffs point out that after these inaccuracies were identified, Dr. Singer ran a comparison that determined price card information reliably matched the actual prices paid in at least 75 percent of the transactions. (Id. at 93)  Moreover, when certain data points were excluded,[25] Dr. Singer found that price card data matched transactional data for 95 percent of the transactions. (Id. at 65)  Thus, he contends that price cards provide accurate data for his regression analysis of lens casters. (Id.)

Direct Purchaser Plaintiffs cannot be faulted for failing to use transactional data when Defendants acknowledge that the data set was flawed at the time Dr. Singer was writing his report on class certification.  However, the parties do not agree on the magnitude of the data problems.[26] Regardless, it is unclear why Dr. Singer did not simply conduct the analysis with price card data once the data set was corrected.  Instead, he ran a separate comparison to show that price card data and transactional data matched sufficiently. Although he later used price card data for Group A in his merits report, Dr. Singer also modified his regression analysis.  (See Dkt. 450 at 88-92)  In his report for class certification, Dr. Singer's analysis of lens casters examines the "exclusivity share," or the percentage of photochromic lenses that Transitions sold during any given year pursuant to

---

[25] The exclusions were observations that showed up solely in the price card data, not in the corresponding transactional data.  Dr. Singer theorized that these data points represented sales that were never consummated. (Dkt. 434 at 61, 93)

[26] Dr. Singer testified that Transitions had alerted him in a letter dated May 14, 2012  that some of the information incorporated in the transactional data was inaccurate for the years 2002 to 2004.  However, along with the letter, Transitions provided corrected data.  Even so, Dr. Singer explained that he did not attempt to integrate the corrections and use transactional data because the process would have been too time-consuming, and his class certification report was due on June 15, 2012. Defendants explain that the abnormalities in the transactional data affected only the coding, not the prices reported.  They maintain that Dr. Singer avoided transactional data because it did not provide the results he needed for the lens casters.

exclusive contracts.  (Dkt. 441 at 85)  In his subsequent merits report, Dr. Singer measured the

impact on lens casters by using the "foreclosure share," which is the product of the exclusivity share

and Transitions' share of the market. (Dkt. 434 at 73-74; Dkt. 450 at 88-97)

Recognizing that the Group A analysis is essential to Direct Purchaser Plaintiffs' case, the

Court finds that the use of price card data is problematic in establishing impact on lens casters.  See,

e.g., Blades v. Monsanto Co., 400 F.3d 562, 570 (8th Cir. 2005) (affirming denial of class

certification where national list prices did not reflect actual prices paid by consumers).[27]  The use

of multiple models and price card data are not the only weaknesses in the econometric methodology

for showing impact, however.

**(c) Statistical Significance Measure**

In another questionable aspect of his analysis, Dr. Singer used a 50 percent statistical

significance measure although a more rigorous 5 percent measure is generally accepted practice

among economists.[28]  Dr. Leonard testified that Dr. Singer's reliance on a 50 percent level

---

[27] See also In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 314 (3d Cir. 2008) (questioning plaintiffs' use of "price-increase announcements" to show antitrust impact); In re Wholesale Grocery Prods. Antitrust Litig., No. 09–MD–2090 ADM/AJB, 2012 WL 3031085, at *14 (D. Minn. July 25, 2012) (explaining that list prices did not establish common proof of impact because defendants were not responsible for setting list prices); In re Flash Memory Antitrust Litig., No. C 07–0086 SBA, 2010 WL 2332081, at *8 (N.D. Cal. June 9, 2010) (stating that failure to analyze actual rather than list prices precluded class certification); In re Plastics Additives Antitrust Litig., No. 03–CV–2038, 2010 WL 3431837, at *6 (E.D. Pa. Aug. 31, 2010) (denying certification, in part, because plaintiffs could not establish connection between price-increase announcements and prices paid by customers).

[28] Dr. Singer defended his use of a 50 percent significance level because that standard "more closely corresponds to what I understand to be the plaintiff's civil burden." (Dkt. 434 at 52) Putting aside the question of whether a 50 percent margin meets the preponderance of evidence standard in civil cases (if that is what Dr. Singer was referring to), use of that percentage in regression analysis to prove common impact is troubling.

establishes that his model is fatally flawed.[29] Nonetheless, when Dr. Leonard imposed the stricter standard (5 percent significance) on Dr. Singer's model, he found that more than 90 percent[30] of purchases of Transitions' photochromic lenses were impacted in comparison to the 99.8 percent impacted at the 50 percent level of significance.[31] (Dkt. 453 at 148)

Plaintiffs argue that the impact on more than 90 percent of purchases demonstrates a feasible impact methodology, which is all that is required at the class certification stage. See In re Titanium Dioxide Antitrust Litig., 284 F.R.D. 328, 347 (D. Md. 2012) (explaining that the real question is "whether the plaintiffs have established a workable multiple regression equation, not whether plaintiffs' model actually works"). Direct Purchaser Plaintiffs would have a stronger argument if this were the only problem with their approach.

But given the multiple models, the changing regression analyses, the price card data, and the use of a 50 percent statistical significance level, Plaintiffs have failed to demonstrate by a preponderance of evidence a workable methodology to gauge impact on all members of the class through methods based on common evidence. While a court cannot make credibility determinations in a class certification decision, it nevertheless must undertake a rigorous analysis to determine

---

[29] Dr. Leonard testified that Dr. Singer's standard is "completely inconsistent with the way economists do things" and that if one surveyed journal articles over the past fifty years, "you'd be very hard-pressed to find anybody who used a 50 percent significance level." (Dkt. 434 at 109)

[30] Although the exact percentage is redacted from Dr. Leonard's report (Dkt. 453 at 148) along with an entire column of data, Direct Purchaser Plaintiffs cite the exact percentage without redaction in their reply brief. (Dkt. 443 at 11) The figure was also testified to by Dr. Singer in a courtroom that was open to the public. (Dkt. 434 at 50-51, 54)

[31] Dr. Leonard's analysis did not end after applying the 5 percent significance level. He then made a series of adjustments to correct what he saw as errors in Dr. Singer's approach and ultimately concluded that 0 percent of the transactions were impacted by Defendants' exclusivity agreements. (Dkt. 453 at 148)

whether the prerequisites of Rule 23(a) and Rule 23(b)(3) are satisfied.  See Wal-Mart, 131 S. Ct. at 2551.  Direct Purchaser Plaintiffs' methodology does not survive this analysis. Both legally and factually, the predominance requirement of Rule 23(b)(3) has not been met.

Due to Direct Purchaser Plaintiffs' failure to establish adequacy of representation under Rule 23(a) and predominance under Rule 23(b), it is unnecessary to address whether the second facet of Rule 23(b)(3) – superiority – has been met.

### Conclusion

For the foregoing reasons, the Court finds that Direct Purchaser Plaintiffs have not carried their burden of establishing that all of the requirements of Rule 23(a) and Rule 23(b)(3) for class certification are satisfied.

Accordingly and upon consideration, it is **RECOMMENDED** that:

(1)    Direct Purchaser Plaintiffs' Motion for Class Certification (Dkt. 285) be **DENIED.**


**Date: March 12, 2013**

ELIZABETH A JENKINS
United States Magistrate Judge


### NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of this service shall bar an aggrieved party from attacking the factual findings on appeal.  See 28 U.S.C. § 636(b)(1).

Copies to:
Counsel of Record
District Judge

**Appendix I**



(Dkt. 442 at 9 Fig. 2)